UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Jr., Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. CR 18-00560-HSG** |
| | ) | |
| ANTHONY REED, | ) | |
| | ) | |
| Defendant. | ) | |

Oakland, California
Monday, December 17, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
    **DAVID L. ANDERSON**
    United States Attorney
    450 Golden Gate Avenue
    San Francisco, California 94102
**BY: SAMANTHA SCHOTT**
    **ASSISTANT UNITED STATES ATTORNEY**

For Defendant:
    THE KEITH LAW OFFICE, P.C.
    214 Duboce Avenue
    San Francisco, CA 94103
**BY: SEVERA KEITH, ESQUIRE**

For Pretrial Services: **JESSICA PORTILLO**

Reported By: Pamela Batalo-Hebel, CSR No. 3953, RMR, FCRR
    Official Reporter

| | | |
|---|---|---|
| 1 | **Monday - December 17, 2018** | **11:08 a.m.** |

P R O C E E D I N G S

---oOo---

**THE CLERK:** We're calling CR 18-560, United States vs. Anthony Reed.

Please step forward and state your appearances for the record.

**MS. SCHOTT:** Good morning, Your Honor. Samantha Schott appearing for the United States.

**THE COURT:** Good morning, Ms. Schott.

**MS. KEITH:** Good morning, Your Honor. Severa Keith for Mr. Anthony Reed, who is again present in court in custody.

**THE COURT:** Good morning, Ms. Keith.

**THE PROBATION OFFICER:** Good morning, Your Honor. Jessica Portillo with Pretrial Services.

**THE COURT:** Good morning, Ms. Castillo.

We are here for a hearing on the Government's motion to revoke the pretrial release order entered by Judge Ryu. Judge Ryu, as in the remainder of these cases, has stayed the execution of the release order pending this Court's decision.

So I've reviewed the motion, Ms. Schott's declaration and the attached exhibits, the opposition filed on Mr. Reed's behalf by Ms. Keith on December 13th. I have also reviewed the transcripts of the recordings from the detention hearings on November 30th and December 11th, as well as the bail report.


1    For Mr. Reed there was a single bail report; correct?
2  There was not a supplement?
3         **MS. KEITH:**  There was a supplement, Your Honor.
4         **MS. SCHOTT:**  There was a supplement, Your Honor.  It
5  was prepared on December 10th.
6         **THE PROBATION OFFICER:**  Your Honor, I have a copy.
7         **THE COURT:**  Please.  I believe I've reviewed it,
8  but -- all right.  Yes.  That's right.  Okay.
9     So the dates of the bail studies -- the addendum was
10 December 10th.  What was the date of the original study?  I've
11 got it here.  November 29th.  All right.
12    Is there more in the record beyond that?
13        **MS. SCHOTT:**  No, Your Honor.
14        **MS. KEITH:**  I believe that's all on the record,
15 Your Honor.
16        **THE COURT:**  All right.
17    So, Ms. Schott, obviously I've read the proffers that you
18 made before Judge Ryu and you need not repeat them, but you can
19 make whatever proffer you believe is appropriate at this point.
20        **MS. SCHOTT:**  Yes, Your Honor.  And I'll make it brief
21 as I think I covered most of our argument, if not all of our
22 argument, in the motion.
23    But Mr. Reed is charged with a violation of 924(c), along
24 with numerous firearms trafficking charges as well and assault
25 and robbery charges.  And Mr. Reed, as I noted in our motion,

1  is the central player in this firearms trafficking conspiracy
2  that lasted at least from January 2018 through October of 2018
3  and culminated in the gunpoint robbery of the federal agent on
4  November 19th of 2018.
5      Mr. Reed, as he is charged with the 924(c) charge under
6  Section 3142, it is presumed that he -- that no conditions or
7  combination of conditions can reasonably assure the safety of
8  the community or his future appearance in court should Mr. Reed
9  be released, and it is the Government's position that Mr. Reed
10 has not proffered any information that can effectively rebut
11 the presumption against him.
12     Should the Court find that Mr. Reed has rebutted the
13 presumption, it is the Government's position that we still have
14 presented sufficient information to establish by clear and
15 convincing evidence that Mr. Reed poses a significant danger to
16 the community and that no condition or combination of
17 conditions can reasonably assure the safety of the community
18 should he be released.
19     Mr. Reed was a resident of Nevada at the time of the
20 charges in the Indictment.  He has some -- he has ties to the
21 Northern District of California, but it is not clear that he
22 was residing here during any time but instead was visiting here
23 and bringing guns with him from Nevada when he came to sell.
24     He personally was involved in the sale of 29 firearms to
25 the undercover agent, but as the Government has proffered, is

likely responsible for dozens, if not up to a hundred more guns, based on what he was posting on social media.

He posted numerous videos suggesting that he was advertising 16 guns for sale on one date, 8 on another date, 11 on another date, none of which were guns that the Government was able to obtain from Mr. Reed. He indicated that he had already sold the guns, and, in fact, on one date when the Government had -- when the agent had coordinated to buy five firearms, just a few hours later, Mr. Reed had already sold four of them and was only able to produce one of those guns to the agent.

This conduct indicates that Mr. Reed has been effectively flooding the community with guns over the past few months.

**THE COURT:** Let me ask this: I've obviously had many gun-trafficking cases of this type, and it's not uncommon for the defendants in those cases for that offense to be on pretrial release in some manner, depending on their individual characteristics.

It seems to me that what's animating the Government's position here is the 924, and you don't have to confirm that or not, but it's pretty apparent to me sitting in this seat.

What is your proffer as to Mr. Reed's particular involvement? I know that all the defendants are charged in the 924(c) conspiracy/aiding and abetting. There are three people who either pointed guns at the undercover or were right there

and everyone else has some other role that is being alleged.

What is the nature of your proffer as to Mr. Reed's involvement in that offense?

**MS. SCHOTT:** Yes, Your Honor.

On November 15 of 2018, Mr. Reed reached out in order to confirm the contact information for the undercover agent. He wanted to make sure that he had the right phone number for the agent, and then that same day, Mr. Sanchez, his co-defendant, in fact, contacted the undercover agent to set up the ruse that in fact was setting the agent up to be robbed.

**THE COURT:** So what is the logical link between those things? You say that Mr. Reed reached out to someone to get the agent's number?

**MS. SCHOTT:** That's correct, Your Honor. So it's our belief that Mr. Reed was coordinating the robbery, that he was obtaining the contact information in order to provide it to Mr. Sanchez in order to have Mr. Sanchez be the person who actually conducted the robbery along with two other co-defendants so that Mr. Reed could stay behind the scenes, which was something Mr. Reed had done during the course of the firearms trafficking conspiracy as well.

On the date of the robbery, Mr. Reed was driven to Mr. Sanchez's house before the robbery occurred by his co-defendant, Mr Faison. Mr. Reed got out of the car at Mr. Sanchez's house to talk to Mr. Sanchez.

 1       We do not have surveillance of that conversation.  We
 2  don't know what was said, but I would submit that it was --
 3  based on what happened immediately thereafter, there is reason
 4  to believe that they were coordinating the final details of the
 5  robbery that was about to occur because once Mr. Reed got back
 6  into the car that he had arrived in, Mr. Sanchez drove away,
 7  and Mr. Reed's car followed directly behind.
 8       They both arrived -- both vehicles arrived at the robbery
 9  location.  At that point, Mr. Reed's co-defendant,
10  Mr. Medeiros, got out of Mr. Reed's car, and I say "Mr. Reed's
11  car."  Again, that's the car that he was riding in, but that
12  car actually belonged to Mr. Medeiros, his co-defendant.
13       Mr. Medeiros got out of the back seat of the car, met with
14  Mr. Sanchez and Mr. Martinez.  The robbery took place at that
15  location, and Mr. Medeiros got right back into the car that
16  Mr. Reed was riding in, and they drove away together.  Mr. Reed
17  was stopped about two blocks away with Mr. Faison,
18  Mr. Medeiros, and a loaded firearm concealed in the center
19  console of the vehicle between Mr. Faison and Mr. Reed.
20       Mr. Medeiros was one of the people who was on the ground
21  pointing a firearm at the agent and stealing his property, and
22  Mr. Medeiros actually walked away with the undercover's gun as
23  well, which has since been recovered.
24       So, Your Honor, while Mr. Reed was not personally on the
25  ground for the robbery, we believe that he was an active

participant in planning, if not the primary planner.

    That is the information that I have at this point as to Mr. Reed's role.

    **THE COURT:** Just as to your belief, obviously there's a certain inference that one could argue from the facts that you've laid out, but to be clear, there is no evidence, at least that you're proffering, of the content of the communications that occurred at these points.

    **MS. SCHOTT:** That's correct, Your Honor. At least at this point.

    **THE COURT:** All right. You can continue.

    **MS. SCHOTT:** Your Honor -- and the Court is correct, that we are leaning heavily on the presumption in this case or the 924(c) charge in this case because I think it is indicative of the danger that Mr. Reed poses to the community more so than just your average gun trafficker who comes before this Court.

    Mr. Reed, as I mentioned, not only has he been flooding the community with guns, but he doesn't take guns seriously. He posts on social media videos of himself wandering around pointing a gun at a person, at least in one video; waving guns around; brandishing multiple different guns in videos; boasting about the guns that he has because -- it is -- we proffer that he treats guns like toys and like trophies and doesn't take them seriously, despite the danger that they pose and -- the danger that they pose that he personally knows about given his

history as being himself a victim of gun violence.

Given his attitude towards firearms, it's not surprising that he would be involved in the gunpoint robbery of an agent because he, again, doesn't take the danger that they pose seriously. He is financially motivated and is willing to put his own interests above the community, has done so over and over again and again, culminating in that gunpoint robbery.

And, Your Honor, it is that attitude and that motivation that makes him such a danger to the community and more so than I believe other defendants who have come before this Court.

For those reasons, we believe that Mr. Reed cannot rebut the presumption, but even if he is able to offer enough to rebut the presumption, the Government has still established by clear and convincing evidence that he poses too great a danger to the community to be able to be released.

**THE COURT:** All right.

Ms. Keith?

**MS. KEITH:** Thank you, Your Honor.

I would just -- I think I made all of these arguments last week so I'll keep them brief.

I believe that what rebuts the presumption in this case are a couple of things but primarily is that Mr. Reed -- he doesn't have a history of violence. He has one juvenile adjudication when he was 16 years old that is indicative of some sort of physical altercation or violence, but since that

1  time as an adult, he has no criminal convictions. His two
2  arrests are drug-related. He has a DUI for drugs which was
3  dismissed, and he was apparently arrested for marijuana sales
4  and that was also dismissed.
5      So he -- he has no adult convictions, and I think that
6  speaks volumes as far as his potential danger to the community.
7      You know, also in this particular case -- and I think
8  Your Honor was asking questions that were along these lines to
9  the Prosecution or to the Government -- is that, you know,
10  there's -- whatever inferences you might make from Mr. Reed's
11  contacts regarding the -- what ultimately was the robbery of a
12  federal agent, given the Government's other proffers and,
13  indeed, the Indictment, I think the more probably reasonable
14  presumption would be that he knew a gun deal was going to
15  happen, but there's actually been no evidence proffered that he
16  actually knew that a robbery was going to happen.
17      There is no proffer that Mr. Medeiros at any point
18  brandished a gun or showed a gun to Mr. Reed or showed him the
19  agent's gun upon his returning. There is just no evidence that
20  Mr. Reed -- and I would proffer to the Court that Mr. Reed
21  from -- you know, based on the Indictment, there is not any
22  evidence that he actually knew that a robbery was going to take
23  place.
24      And so I think that really sets him apart -- without any
25  question, he is set apart from the people who actually

1    conducted the robbery.  I think that would be the case under
2    any set of circumstances.
3         So, you know, also which rebuts the presumption of any
4    danger to the community, which I think is -- would be the
5    Court's concern, of course, is that in his adult life, he has
6    engaged in a number of pro-social activities and done some
7    things that actually set him apart and indicate that he is
8    not -- he's not a danger.
9         So, for example, in addition to his lack of criminal
10   convictions, he has worked throughout his life, and, in fact,
11   despite his charges and despite any mistakes he may have made
12   in recent months, he completed 1200 of 1500 hours of barber
13   school and actually has a work history working at barber shops
14   and cutting hair and making money legitimately that way.
15        He also has helped to support his relatives.  He has --
16   he's got a family.  Some of his family members are present, and
17   he's got a -- good family connections here in the Bay Area.  He
18   also graduated from high school.
19        The other thing that I want to point out as far as the
20   risk of flight, Mr. Reed has very deep community ties to the
21   Bay Area.  He was born and raised here.  He graduated from high
22   school here.  He went to barber school here.  He has worked
23   here.  And it appears like the time period that he resided in
24   Nevada was for this very brief period of time, and he has no
25   reason to return there.

|   |   |
|---|---|
| 1 | So all of his ties are really in the Bay Area, and he |
| 2 | doesn't have anywhere else to go.  He doesn't have family or |
| 3 | friends in any other part of the country, much less really in |
| 4 | any other part of California, from what I can tell.  His family |
| 5 | is basically in the Central Valley in the Modesto area and in |
| 6 | the San Leandro and Oakland area. |
| 7 | Oh, and also I -- I argued this before Judge Ryu also. |
| 8 | With respect to the Government's assertions that what they have |
| 9 | perceived as being Mr. Reed's attitude towards guns is making |
| 10 | him a danger, in think in their motion to revoke the release, |
| 11 | the words like "toys" and "trophies" were used, and one thing I |
| 12 | proffered to Judge Ryu is that to the best of my knowledge, |
| 13 | that Nevada is an open-carry state.  As far as arguments being |
| 14 | made as far as Mr. Reed basically doing target practice in what |
| 15 | appears to be the desert in a completely unpopulated area, I |
| 16 | don't know where that was.  I don't know if that behavior was |
| 17 | legal or not, but it's certainly -- I would proffer to the |
| 18 | Court that if that behavior is not legal, it is very typical, |
| 19 | and I think probably especially in states like Nevada where |
| 20 | there is such a very legal and very open gun culture and a lot |
| 21 | of wide-open lands, so I think the fact that Mr. Reed was |
| 22 | shooting guns is hardly a surprise. |
| 23 | **THE COURT:**  Well, but -- I mean, look, we can all |
| 24 | understand, and Judge Ryu understood, it's concerning, and so I |
| 25 | don't know that it helps to portray it as not concerning. |

1           **MS. KEITH:**  Oh --

2           **THE COURT:**  Whether it's actually illegal or not is,
3  in my view, somewhat beside the point.

4        But I understand your point.  But you get it.  Judge Ryu
5  was concerned.  I'm concerned.  Even if I affirm the order,
6  I've got well-founded concerns based on what the Government has
7  proffered.

8        And really what I'm trying to do is see into the future
9  and figure out is this person going to comply in a way that he
10 hasn't, at least based on what's been proffered to me, or not,
11 and so that's -- I'm trying to assess and make a judgment as to
12 the likeliest future course of conduct.

13       And he'll be on lockdown at the halfway house.  We won't
14 have to have the Nevada/California debate, but I would posit to
15 you and to Mr. Reed that it might be a good idea to stop
16 posting that kind of video, stop engaging in that kind of
17 conduct.

18          **MS. KEITH:**  Of course.  Absolutely, Your Honor.

19          **THE COURT:**  Period; right?  Period.

20          **MS. KEITH:**  Of course.  Of course.  There's no doubt
21 that that conduct well would end him straight back into custody
22 and probably in more trouble, I would assume.

23       So, no, Your Honor -- and I'm not saying that there aren't
24 things to be concerned about the record and certainly about the
25 charges.

1    But in this circumstance, Mr. Reed understands that he is
2    facing very serious charges, and the question, I think, is are
3    there circumstances that can ensure the safety of the community
4    and his return to court should he be released, and I do believe
5    that what Pretrial Services has recommended is sufficient.
6    As far as flight goes, I don't believe that -- as I
7    proffered to the Court, Mr. Reed actually doesn't haven't
8    anywhere to flee as far as family in other places or a
9    passport, but also he understands that this is an opportunity
10   for him to do the best that he can while this case is pending.
11   He also understands that his cousin is risking losing
12   $75,000 on the unsecured bond that she has signed if he flees
13   or if he in any way violates the conditions of his release,
14   which would include committing any other crime or leaving the
15   halfway house or not complying with the rules of the halfway
16   house, and he does understand that.  And his cousin, Jessica
17   Reed, who signed the bond, she also understands that, and she
18   was willing to sign the bond.
19   So I just think that under these conditions where he's
20   going to be in a halfway house, I do think that that ensures
21   the safety of the community.  And I also don't think that under
22   the circumstances, that Mr. Reed would attempt -- in fact, I'm
23   sure that he is not going to attempt any of the sort of
24   behaviors that are indicated in the Indictment.
25   And I do think that being on lockdown in a halfway house

1  is a very, very restrictive environment.
2      **THE COURT:** Let me ask this of Ms. Portillo, and I
3  apologize for getting your name wrong when we started.  My
4  apologies.
5     What halfway house is being proposed as the placement?
6      **PRETRIAL SERVICES OFFICER:** It would be the halfway
7  house in Oakland.
8      **THE COURT:** It is Oakland?
9      **PRETRIAL SERVICES OFFICER:** It is.
10     **THE COURT:** Where is that located?
11     **PRETRIAL SERVICES OFFICER:** It is on MacArthur.
12     **THE COURT:** I thought at least there was some
13  reflection in the record previously that it would be
14  San Francisco.  Has that changed?
15     **PRETRIAL SERVICES OFFICER:** We can place him there if
16  there is room.  I do apologize.  I was not here at the last
17  hearing, and I did not see that in the notes.
18     **THE COURT:** Well, I think Oakland would be better.  He
19  is being supervised in Oakland.
20     **PRETRIAL SERVICES OFFICER:** If he was placed in the
21  San Francisco halfway house, he would be supervised out of the
22  San Francisco office, so either office we would be able to have
23  access to him.
24     **THE COURT:** I'm not advocating for San Francisco at
25  all.  I think Oakland makes more sense, so it is good to hear

that that is what's being proposed.

All right. Ms. Schott, any response?

**MS. SCHOTT:** Your Honor, I would just briefly respond as to what the reasonable inference is about what Mr. Reed knew about what was going to happen on the 19th, and I would note that Mr. Medeiros was not involved in the firearms trafficking conspiracy prior to that date. He is not charged in any of the counts. We have absolutely no evidence that he has ever been involved in the firearms trafficking conspiracy, so if Mr. Medeiros was there, if they were riding in Mr. Medeiros's car, if Mr. Reed -- or if Mr. Medeiros was the one going to the purported transaction in lieu of Mr. Reed, I think it's -- it's clear that something was different about this day. This was not just a normal gun transaction that they were doing, and as a result, it's the Government's position that the reasonable inference is that Mr. Reed knew very well that there was about to be a robbery, even if he hadn't coordinated it, although we again submit that he, in fact, was integral in the planning of the robbery.

**THE COURT:** All right. Well, obviously that will be one of the pivotal questions to be resolved in the substance of the case.

I agree with Judge Ryu's finding that the case is a close one and also agree with her conclusion that the result of that closeness under the Bail Reform Act is that the conditions

|   |   |
|---|---|
| 1 | proposed are significant -- sufficient to mitigate the quite |
| 2 | apparent danger and flight risk concerns that Mr. Reed's case |
| 3 | poses. |
| 4 | And I'll tell you, Mr. Reed, this is a zero-tolerance |
| 5 | situation and you just need to understand that. If you have |
| 6 | any violation of the terms of release, I will not hesitate to |
| 7 | remand you. It will go to Judge Ryu first. But I'm telling |
| 8 | you, if it's my decision, that is what will happen because you |
| 9 | are cutting it as close as you could. So it's up to you. And |
| 10 | you're the only one that can make this the right decision or |
| 11 | the wrong decision. |
| 12 | But I'll just tell you, as far as I'm concerned, you had |
| 13 | better comply with the absolute chapter-and-verse letter of |
| 14 | these conditions, and if you don't, if I have anything to say |
| 15 | about it, you will be remanded because there is a lot in the |
| 16 | record here that is concerning to me. |
| 17 | So I just -- I put that to you and that's -- you're the |
| 18 | only one that can follow through on that. So that's -- but I |
| 19 | want it to be crystal clear to you what the consequences would |
| 20 | be of a violation. Do you understand? |
| 21 | **THE DEFENDANT:** Yes, sir. |
| 22 | **THE COURT:** All right. So the motion to revoke is |
| 23 | denied. |
| 24 | Anything further for today? |
| 25 | **PRETRIAL SERVICES OFFICER:** Your Honor, I do have |

1  clarification.
2  　　　I did speak with Ms. Schott about the halfway house
3  differences.  Apparently it was proposed last week by
4  Officer Kupu that he go to the San Francisco halfway house
5  because she did not know if there was any room at the Oakland
6  halfway house.  I did confirm this morning at the Oakland
7  halfway house that there is room, so the bond address does show
8  the San Francisco halfway house.  That would need to change.
9  　　　　　　**THE COURT:**  I see.  I think the best bet would be to
10  just resolve that with Judge Ryu.  I cannot imagine that she
11  would not, for an Oakland-venue case, prefer the Oakland
12  halfway house if available.
13  　　　Why don't you confirm that with her and then that will be
14  the last step to executing the release order.
15  　　　　　　**MS. KEITH:**  Just for full information, I briefly spoke
16  with Officer Kupu -- and perhaps you could follow up with
17  this -- after court last week.  I asked her why San Francisco,
18  and apparently there seems like some administrative issues with
19  pretrial people going to the Oakland halfway house at this
20  point as well.  So I'm happy with Mr. Reed being in either
21  location, obviously, but --
22  　　　　　　**THE COURT:**  All right.
23  　　　　　　**MS. KEITH:**  -- it seems a complicated situation, is
24  all.
25  　　　　　　**THE COURT:**  Right.  And I am not intending to here

```
1    amend the bond that was earlier entered, so if that is capable
2    of execution, then that is fine.  If there is a proposed change
3    from Pretrial Services' perspective, please raise that with
4    Judge Ryu.
5              **PRETRIAL SERVICES OFFICER:**  Yes, Your Honor.
6              **THE COURT:**  Anything further for today?
7              **MS. SCHOTT:**  No, Your Honor, thank you.
8              **MS. KEITH:**  Thank you.
9              **THE COURT:**  All right.
10                  (Proceedings adjourned at 11:36 a.m.)
```

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, April 16, 2019

_____
Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter